UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO. 0:10-CV-62344-MGC

OSCAR BAEZ, as Personal Representative
of the Estate of MARTHA BAEZ, Deceased,

      Plaintiff,

v.

BRIDGESTONE AMERICAS TIRE
OPERATIONS, LLC, a Foreign Limited
Liability Corporation f/k/a BRIDGESTONE
FIRESTONE NORTH AMERICA TIRE, LLC,
Successor to BRIDGESTONE/FIRESTONE,
INC.; FORD MOTOR COMPANY, INC., a
Foreign Corporation; WALMART, a Foreign
Corporation; WALMART STORES EAST, LP,
a Foreign Business Entity; RONALD RUFF;
BASIL DIXON and JOHN DOE,

      Defendants.

---

## PLAINTIFF'S *DAUBERT* MOTION

---

      Pursuant to L. Gen. R. Rule 5.4, FRE 702 and applicable case law, the Plaintiff, OSCAR

BAEZ, as Personal Representative of the Estate of MARTHA BAEZ, Deceased, by and through

undersigned counsel, hereby moves to preclude/limit the testimony of Defense Experts Kenneth

Bynum and Dr. Michael Woodhouse, because such opinions fail to meet the admissibility

requirements under the <u>Daubert/Kuhmo Tire</u> standard defined below.[1]  In support of this motion, the Plaintiff represents as follows:

## I.    CASE OVERVIEW

### A.    The Accident

This wrongful death matter arises from the death of Martha Baez, age 48, killed as On October 29, 2008, at approximately 6:24 a.m., Martha and Rafael Baez were traveling in a 1998 Ford Ranger pick-up, with Mrs. Baez driving and Mr. Baez in the front passenger seat.  They were heading south in the number 2 lane on I-95 in Fort Lauderdale, just south of West Cypress Creek Road at approximately 6:24 a.m.   The vehicle was equipped with two rear tires manufactured by Bridgestone/Firestone (brand name, "Cornell") in late 2001.   Uncontested evidence adduced during the discovery of this matter, including depositions of law enforcement and fire rescue personnel, as well as expert evaluation of the accident scene, subject truck and subject tires, demonstrates the right rear Cornell tire sustained a partial tread belt separation (delamination) while Mrs. Baez was driving at or below the posted speed limit.  See **Exhibit A**, FHP Photo of subject tire.

During the tread belt separation event, it is likely the attached tread piece of the tire repeatedly struck the underside of the wheel well with each revolution of the wheel, acting as a one-sided brake on the vehicle and causing it to yaw clockwise uncontrollably.  See **Exhibit B**, FHP Photo showing extensive damage to the wheel well caused by the loose tread flap.  The Ranger went off the road more than ninety degrees from its original path of travel.  See **Exhibit C,** Accident Reconstruction Report and Diagram of David Bilek.  Once leaving the roadway, the

---

[1] For ease of reference, this standard is collectively referred to as "the Daubert Standard."

Baez vehicle struck a large tree on the driver's door "A" Pillar at a speed of approximately 28 MPH. **Exhibit C**, Bilek report at 9; Composite **Exhibit D**, FHP Photos of accident scene and Baez vehicle at final rest.

Ms. Baez, who was reportedly unbelted, was thrown <u>rearward and to the left</u>, hitting her head on the vehicle's B-pillar and suffering a skull fracture and massive brain damage above her left ear. See **Exhibit E**, autopsy photos of Mrs. Baez's head. Her head struck the "B" Pillar and likely struck the D-ring through which the seat belt travels. Although she was unbelted, it is irrefutable from the physical evidence that the impact with the tree caused 19 inches of intrusion into the driver's compartment. Due to the magnitude and direction of the forces, the Plaintiff's position is consistent with the facts that Mrs. Baez's injuries would have been the same, with or without the belt.

### B.    Plaintiff's Claims Against Wal-Mart

The Plaintiff has alleged Wal-Mart was negligent in knowingly mounting these old rear tires, in that they were dangerous and defective in condition, leading to the tread belt separation and causing the fatal accident.

### C.    Expert Opinion at Issue

Wal-Mart relies on opinions of their accident reconstruction expert, Mr. Bynum, and their bio-mechanical expert, Dr. Woodhouse, in pursuit of the claim that had Mrs. Baez been wearing a seat belt, she would not have received her fatal head injury, a claim that ignores hard evidence and uncontested laws of physics. Wal-Mart also plans to offer testimony from one or both of these witnesses that Mrs. Baez somehow caused the accident based on her steering inputs once the tread belt separation occurred, without ever having analyzed the known effects of de-treading

3

on vehicle controllability and absent any objective basis.

For reasons discussed below, these opinions should be excluded because they fail to pass the admissibility requirements for expert opinion as set forth in FRE 702, as construed by Daubert v. Merrell Dow Pharms, Inc., 509 U.S. 579 (1993), Kumho Tire Co., Ltd. V. Carmichael, 526 U.S. 137 (1999) and their progeny ("the Daubert Standard").

Mr. Bynum's expert report is attached as **Exhibit F**.  Mr. Bynum's deposition testimony is attached as **Exhibit G**.

Dr. Woodhouse's expert report is attached as **Exhibit H**.  His deposition testimony is attached as **Exhibit I**.

## II.      APPLICABLE LAW

### A.      FRE 702

FRE 702 permits a witness to render an "expert" opinion only if five conditions are met: 1) the witness must be "qualified as an expert by skill, experience, training or education", 2) the witness must have "scientific, technical, or other specialized knowledge" that will "assist the trier of fact to understand the evidence or to determine a fact in issue", 3) the testimony must be "based upon sufficient facts or data", 4) the testimony must be "the product of reliable principles and methods", and 5) the witness must have "applied the principles and methods reliably to the facts of the case." *See* FRE 702.

### B.      The Daubert Standard

If the conditions of FRE 702 are not met, the trial court must exclude the evidence.  See Daubert v. Merrell Dow Pharms, Inc., 509 U.S. 579 (1993).  The Daubert Court focused on the admissibility requirements of expert testimony under the federal rules, and indicated such

testimony is admissible "only if it is both relevant and reliable." Kumho Tire Co., Ltd. V. Carmichael, 526 U.S. 137, 141(1999). Rule 702 imposes a general "gate-keeping" function obligation on the district judge to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Magistrini v. One Hour Martinizing Dry Cleaning, 68 Fed. Appx. 356 (3rd Cir. 2003); McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002).

This gate-keeping function applies not only to scientific testimony but also on testimony requiring "other specialized" knowledge, such as engineers. Kumho Tire, 526 U.S. at 141; Dimensions Leasing, Inc. v. Variety Children's Hospital, 2007 WL 7626587 *3 (S.D. Florida March 8, 2007, Ungara, D.J.) [2] The district court must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used. Magistrini, 68 Fed. Appx. at 356."

The Supreme Court takes significant issue with the unsupported ipse dixit of an expert, holding that it should be excluded. General Electric Co. v. Joiner, 522 U.S. 36, 45-46 (1997). According to the Court in General Electric, trained experts commonly extrapolate from existing data. However, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert [and a ] court may conclude that there is simply to great an analytical gap between the data and the opinion proffered." General Electric, 522 U.S. 36, 45-46 (1997).

---

[2] Note that the party offering expert testimony must establish that the expert's opinions are scientifically valid and methodologically sound. Daubert, 509 U.S. at 592; Dimensions Leasing, 2007 WL 7626587 *3. Further, the burden of laying the proper foundation for admission of expert testimony is on the party offering the experts and admissibility must be shown by a preponderance of the evidence. Bourjaily v. United States, 483 U.S. 171, 175-76 (1987).

Daubert also mandates inquiry into methodology to ensure that an expert's opinions are based upon "methods and procedures of science rather than on subjective belief or unsupported speculation." Gallatin Fuels at *4-5 quoting In re Paoli R.R. Yard PCB Litig., 35 F. 3d 717, 742 (3rd Cir. 1994) (emphasis added). Put another way, the gate-keeping function in assessing the relevance and reliability of opinions of engineers "is to make certain . . . [the engineer] employs the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. Kuhmo Tire, 526 U.S. at 152; Gonzalez v. Cooperativa De Seguros, et al., 2009 WL 3781492 *3 (M.D. Florida, November 10, 2009, Moody, D.J.).

Factors considered to assess reliability include whether (1) the theory or technique can be tested; (2) the theory or technique has been peer reviewed; (3) there is a high rate of known or potential error; (4) there are standards of control; (5) the theory is "generally accepted"; (6) there is a sufficient relationship between the technique and methods which have been established to be reliable; (7) the expert's qualifications are sufficient; and (8) the method has been put to non-judicial uses. Daubert, 509 U.S. at 593-94; Gallatin Fuels at *5.

The relevance and applicability of the Daubert factors depend "on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Kumho at 150. The court's task is to analyze "not what the experts say, but what basis they have for saying it." Daubert, at 1316. The soundness of the expert's methodology is the key focus. Id. at 1318. An expert's "bald assurance of validity is not enough." Id. at 1316. The party offering the expert testimony must show the opinions are supported by "objective, independent validation of the expert's

methodology." _Id_. at 1316.   The expert must explain the means by which he reaches his conclusions, and such means must satisfy at least one of the Daubert factors of reliability and "an expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation."   Oddi v Ford Motor Co., 234 F. 3d 136, 158 (3rd Cir. 2000).

## III.   DISCUSSION

### A.   The Flawed Accident Reconstruction of Defense Expert Ken Bynum Should be Excluded or Significantly Limited Because it is not Reliable Under the Daubert Standard

Wal-Mart hired Ken Bynum as an accident reconstruction expert in support of the claim that had Mrs. Baez been wearing her seat belt, she would not have received the fatal injury to her skull.   Wal-Mart also intends to offer his opinion that Mrs. Baez was at fault for failing to maintain control of her vehicle after the tread belt separated on the passenger-side rear tire.

#### 1.   Flawed and Unreliable Vehicle Speed Analysis

Mr. Bynum has utilized a "critical speed analysis" methodology in support of his opinion that the Baez vehicle was traveling as much as 65 mph at the point in time the vehicle began to yaw/leave tire marks on the road. **Exhibit F** at p. 2; **Exhibit G** at p. 107: 14-18. The analysis is nothing more than calculating the speed of an object as it is going around a curve. **Exhibit J**, Affidavit of David Bilek, at paragraph 10. Use of the critical speed analysis or formula has been widely criticized in the reconstruction field. Id., Attachment 2: "Use of the CFS [Critical Speed Formula] to estimate speed from yaw marks is not universally accepted in the relevant scientific community." This methodology has been tested and researched by many entities because investigators have been known to routinely misapply the equation to reach conclusions about

7

vehicle speed.  Id.  A treatise entitled, "Highway Collision Analysis" from 1967 discusses the application of the critical speed formula to accident reconstruction and simply states "This should not be done."  Id., and Attachment 3 thereto.  In essence, the critical speed analysis tends to over predict vehicle speed and is, therefore, unreliable.  Id.  Thus, it is inadmissible under the Daubert standard.

The "critical speed analysis" requires only two inputs, radius of curvature and coefficient of friction, and is thus attractive for some investigators to use.  However, implicit in the derivation of the equation is that velocity, accelerations (specifically lateral acceleration, or acceleration from the side is constant), and radius of curvature are constant.  Id. at paragraph 11.  Further the vehicle must be tracking, that is the back end is not sliding out, and even more important is that the reason tire marks are being left is the assumption that the tires can only generate tire marks once the maximum coefficient of friction has been reached.  In this accident, tire marks are left because the back end is sliding out, the vehicle yawing or rotating clockwise, thus the vehicle is not tracking.  The tire marks are made not because the vehicle is negotiating a curve at the limit of adhesion of the tires, but rather because the tires are becoming more and more sideways as the vehicle slides across the road.  Thus, the critical speed analysis has no application in the reconstruction of this accident, and any results from such are misleading and unreliable.  Id.  Thus, Mr. Bynum's opinion as to vehicle speed should be precluded.  See case law, *supra*.

In addition, Mr. Bynum has evaluated vehicle speed at the beginning of the on-road tire marks up to impact with the tree by what is in effect the assumption that all four wheels were locked up generating the maximum deceleration along the path of travel.  First, the only way that

is possible in this case is for the driver to be fully braking the entire time. No evidence supports or even suggests this. Id. at paragraph 12. To the contrary, the evidence clearly shows rolling tires through various aspects of the on-road motion. Id. Because the physical evidence is inconsistent with application of Mr. Bynum's methodology in determining speed, his methodology is flawed and his opinion is unreliable, contrary to the principles of the Daubert standards.

Mr. Bynum begins with the assumption that the vehicle is traveling at 65 mph, and utilizing the four wheel locked assumption reduces the speed down to 21 mph, a level which agrees with the previously discussed analysis to determine the ΔV. However, there is an appropriate accepted methodology to use which takes into consideration the vehicle's orientation along the tire marks. See Attachment 4 to **Exhibit J**.

If Mr. Bynum had utilized the appropriate methodology, the resulting impact speed with the tree, based on his assumed 65 mph at the beginning of the tire marks, would be 39 mph; this is inconsistent with Mr. Bynum's ΔV analysis. Therefore either 65 mph at the beginning of the tire marks is too high, or the tree impact speed is too low. In order to agree with his stated ΔV analysis of, the initial speed at the onset of the tire marks must be lowered, closer to 55 mph. Id.

### 2. Opinions that Mrs. Baez failed to maintain control of the vehicle and that her steering inputs caused loss of vehicle control are unsupported speculation without any reliable basis

#### a. Vehicle Control

Mr. Bynum holds the unsupported opinion that, following the de-tread event, "Ms. Baez [should have been] able to control the truck …during 10 second time period between the point it began to detread and the beginning of the yaw marks [or the point at which the vehicle went out

9

of control]." **Exhibit F** at p. 2; see also **Exhibit G** at pp. 101-04.  He also opines that her

steering to the left then back to the right "is a driver input steering maneuver that is known to

cause loss of control of vehicles and was probably the reason [she] lost control when she did."

**Exhibit F** at p. 2; see also **Exhibit G** at p. 106: 11-18.  These opinions are totally unsupported by

the evidence, are not the product of sound methodology and are merely the product of

inadmissible speculation.  Gallatin Fuels at *4-5; In re Paoli R.R. Yard PCB Litig., 35 F. 3d at

742.

First, it is very important that, despite his report, Mr. Bynum testified at his deposition

that he is "**_not_** going to render any opinions about the controllability" of the Baez vehicle "during

the initiation of the de-tread to the point where [it] strikes the tree.  **Exhibit G** at p. 105: 9-17

(emphasis added).  Thus, Mr. Bynum, in his own words, admits he does not have such an

opinion, which, alone, should preclude him from offering it a trial.

Moreover, his methodology in determining facts in support of his opinions regarding

available time to control the vehicle and the ultimate opinion that Mrs. Baez's steering inputs

caused the loss of control consists of unsupported speculation without any objective, reliable

basis.  First, in declaring Mrs. Baez purportedly had 10 seconds of available time to control the

vehicle once the de-tread event initiated, Mr. Bynum did not determine in any reliable manner

where the de-tread of the tire actually began on the roadway, compared to where the loss of

control purportedly began based on yaw marks on the road.  In fact, Mr. Bynum has stated in

deposition that he has "…no opinion about where it started to de-tread."  **Exhibit G** at p. 101: 25

– p. 102: 1.  These are, obviously, two key data points in determining the time, if any, available

to Mrs. Baez to control the vehicle.  The most he could testify to was to *assume* the de-tread

10

event started at the crest of the overpass on the roadway. The assumption is allegedly, based on the report of Mr. Bilek, the Plaintiff's reconstruction expert. **Exhibit G** at p. 102: 1-11. In his report Mr. Bilek simply stated that the right rear started to detread "probably somewhere along the overpass to West Cypress Creek."

The net result is the lack of any objective or evidentiary basis for Mr. Bynum's opinions of the location on the roadway of the onset of de-tread of the tire or a scientific calculation of how long the event occurred (to the extent this information is relevant to whether Mrs. Baez had time to gain control of the vehicle). Absent scientific proof of where the de-tread event commenced, Mr. Bynum has no reliable basis to testify to how long Mrs. Baez had to gain vehicle control, if at all, before the physical evidence in the form of the tire marks left on the road. Given the lack of an opinion or factual basis as to controllability of the vehicle once the tread belt separation occurred, coupled with Mr. Bynum's speculation of where it occurred and for how long, Mr. Bynum has no reliable engineering basis to form an opinion that Mrs. Baez should have, or could have, controlled the vehicle for at least ten seconds from the point of de-tread to the yaw marks. See generally, Kuhmo Tire, *supra*.

### b.   Steering Inputs

Mr. Bynum makes assumptions that the movement of the Baez vehicle from left to right was all due to Mrs. Baez's steering inputs, as opposed to the published effects of the de-tread event itself, even though he knows there are studies that report on the effect of a tire de-tread on vehicle handling. This is tantamount to speculation without any reliable basis in fact. Pertinent testimony follows:

11

    Q.      *** [Y]ou've not factored in any manner what, if any, effect, the de-

              treading of a tire may have had on the steering forces on this vehicle

              moving left or right, correct?

    A.      No, I have not.

**Exhibit G**, at p. 108: 15-20.

    Q.      *** You've not looked to any studies or analysis of the effects on the

vehicle – on a vehicle from a de-treading of a tire?  In other words, what steering

input may impart from a de-treading of a tire, correct?

    A.      Yeah, I've seen studies that have been reported about that.  Sure.

    Q.      But you've not utilized that . . . those in this case, have you?

    A.      No, I haven't.

**Exhibit G**, at p. 109: 7-16.

    Q.      ***So you are ***assuming*** that all of the movement of this vehicle to the left and

             then to the right was based on steering input from Mrs. Baez?

    A.      Yes.

**Exhibit G**, at p. 108: 21-24 (emphasis added).

    Mr. Ken Bynum's opinions concerning the purported causal relationship between vehicle

inputs and the uncontrolled movement of the vehicle are the product of speculation and

assumption and should therefore be precluded under the tenets of the <u>Daubert</u> Standard.

    **B.**    <u>The Bio Mechanical Opinions of Dr. Woodhouse Fail to Meet the Daubert</u>
          <u>Standard Because they are Based on Reliable, Verifiable Input Data</u>

---

[5] MADYMO is a recognized computer program utilized in accident reconstruction and by bio-mechanical experts in recreating body movements (body kinematics) and determining forces on vehicle occupants within vehicles during crash sequences.

Wal-Mart's biomechanical expert, Dr. Woodhouse, has been disclosed to shore up a seat belt defense, i.e., had Mrs. Baez been belted, she would not have received fatal head trauma. He utilized body kinematic computer modeling known as MADYMO[5] to purportedly reconstruct and demonstrate what happened to Mrs. Baez's body during the accident, which provides the sole basis for his opinion that wearing a seat bold would have prevented her from receiving the fatal head strike. As discussed below, his computer modeling, and therefore his opinions, are based upon the incorrect claim he was provided crash pulse or vehicle crush calculations or data from Mr. Bynum. Further, Dr. Woodhouse has failed to provide any reliable basis to establish his hypothesis of the mitigation of injuries that allegedly would have been accomplished by seat belt usage. The flaws in Dr. Woodhouse' analysis and methodology render these opinions inadmissible under the Daubert standard.

1. **Flawed and/or incomplete input data utilized by Dr. Woodhouse render his computer modeling and biomechanical opinions unreliable and inadmissible**

Dr. Woodhouse testified his MADYMO computer modeling relied on, and required, **_Mr. Bynum's findings_** concerning Delta-V, principal direction of force ("PDOF"), vehicle crush analysis (or "crush profile") and duration of velocity changes during the accident (known as "crash pulse"). **Exhibit I** at p. 5: 10-20 (emphasis added). When attempting computer simulation of this type of the motion of an occupant in an accident, it is necessary to be able to define the forces to which the occupant is exposed. **Exhibit J** at paragraph 3. The data is ordinarily provided by the accident reconstruction expert, who would have developed a detailed time history of what is referred to as the "crash pulse". The crash pulse is an acceleration curve defined in milliseconds (1 millisecond = 0.001 seconds). The crash pulse occurs during the

impact phase of an accident. The impact phase and related crash pulse can simply be thought of as occurring during the time in which metal is bending. Id. at paragraph 3.

First, Dr. Woodhouse did not perform any independent analysis to determine vehicle crush or crash pulse. Moreover, there is no information in Mr. Bynum's report, file materials or deposition to establish that he performed *any* crush analysis or crash pulse analysis, much less arrived at a scientifically valid crash pulse value/opinion to provide to Dr. Woodhouse. If Dr. Woodhouse is correct that Mr. Bynum provided him with a crash pulse of 100 milliseconds, a key piece of data for his computer modeling, there is no scientific, objective basis for this finding. This analytical gap in Dr. Woodhouse's work-up renders his opinions inadmissible since they are obviously based upon flawed methodology. General Electric, 522 U.S. at 45-46.

### 2. Failure to test hypothesis and lack of a reliable, objective scientific basis for opinions render findings unreliable and inadmissible

Dr. Woodhouse did not perform any computer modeling to test his hypothesis that seat belt usage would have prevented Mrs. Baez's head trauma. This violates a tenant of the Daubert standard. Daubert, 509 U.S. at 593-94. An example of pertinent testimony is as follows:

Q. Now, did you run any reconstruction or analysis to test the premise, in other words, to show her in a vehicle unrestrained?

A. I did not.

Q. Why not?

A. I was asked not to [by defense counsel]. The assumption was that she was unrestrained and the results were fatal injuries. I simply ran the iteration with her being restrained to see if it would effectuate a reduction in force and the likelihood of fatal trauma. **Exhibit I** at p. 15: 7-16.

14

Dr. Woodhouse has admitted that, if he had run computer modeling showing Mrs. Baez unrestrained, this would have depicted her body position during the entire accident sequence in a "real world reconstruction of what actually took place." Id. at p. 16, 3-7. According to Dr. Woodhouse, it was certainly possible to do so by developing a more complex model:

> with an unrestraint occupant because there is going to be more contact interactions - with that crash test dummy and that interior of this vehicle. I did not do that. I wasn't asked to do that. I ran one iteration and that is all.

Id. at p. 16: 9-15 (emphasis added). Dr. Woodhouse clearly acknowledged that this testing was something that he could have done, but he did not do. Id. at p. 17: 8-12. More tellingly, Dr. Woodhouse admitted that, in the case of an unrestrained occupant, in order to perform computer modeling, he would need additional information regarding pre-impact and post-impact rotation data. Id. at p. 17: 13-21. He acknowledged the Baez vehicle experienced between 110 and 120 degrees of rotation pre-impact. Id. at p. 18: 1-4. However, he did not utilize this data in his computer modeling.

Dr. Woodhouse has testified that he would need that rotational "position versus time data to show how the occupant who is unrestrained in going to be moving about in the cabin." Id. at pg 18: 4-6. The net result is that, due to his failure to do computer modeling of Mrs. Baez's actual position as an unrestrained driver, Dr. Woodhouse admitted that he has "no idea what in the real world here Mrs. Baez's position would have been because [he did not] place[ ] rotation input into [his] MADYMO model[.]" Id. at p. 18: 16-21.

The result is that Dr. Woodhouse has failed to conduct necessary testing and analysis in support of his hypothesis, rendering his opinions unreliable and not based on sound methodology. There is no reliable, objective basis for his subjective belief that wearing a seat

belt would have changed her outcome with respect to sustaining a fatal head injury. Oddi, 234 F. 3d at 158. He apparently limited his workup based on what he was provided to him by Defense Counsel and by Defense Counsel's specific request telling him *not* to run a computer model depicting Mrs. Baez's unrestrained position in the vehicle. To refrain from conducting a test this expert would otherwise *want* to conduct to evaluate rotational and other forces on a restrained and unrestrained driver is not sound scientific method. This omission in testing is not consistent with "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kuhmo Tire, 526 U.S. at 152.

Further review of the record of Dr. Woodhouse's deposition testimony, in light of the hard evidence, indicates that there is a lack of critical information to provide a reliable basis for his opinions. Dr. Woodhouse has clearly indicated he was unable to come to a determination "as to what injuries Mrs. Baez would have sustained had she been seatbelted[.]" Id. at p. 27: 13-16. In fact, he was *specifically asked not to make this determination*. Id. at p. 27: 17-19 (emphasis added). He did not examine the medical examiner's photographs in determining or evaluating her injuries. Id. at p. 22: 4-7. Not knowing what injuries Mrs. Baez actually sustained as an unrestrained occupant, and not knowing what injuries she would have sustained had she been wearing a seatbelt, are, intuitively, major gaps in his opinion that wearing a seatbelt would have mitigated Mrs. Baez's injuries and speak of unsound methodology. See case law, *supra*.

In addition, he acknowledged that during the accident the vehicle entered into a yaw, with rotational forces in a clockwise direction between 110 and 120 degrees, and traversed a grassy area up to the point of impact, which would have exerted internal forces on Mrs. Baez whether seatbelted or not. He acknowledged these forces would have caused centrifugal force which

would have also pushed the driver towards the far left side of the vehicle Woodhouse deposition

(i.e. closer to the impact point and inward crush into the driver occupant compartment).

However,  he was not provided any data to determine how these forces would have affected her

position and movement within the vehicle.  Id. at p. 22: 13-25; p. 23: 1-2.  Tellingly, Dr.

Woodhouse testified as follows on this point:

Q:     Ok. And what force is that?  What force is that understood to be as the vehicle is

rotating in addition to decelerating?

A:     Centrifugal.

Q:     Have you measured – have you factored – have you received any information as

to centrifugal force that would have been placed upon Mrs. Baez's body in the vehicle whether

she is seatbelted or not?

A:     No sir.

Q:     Ok can we agree that the combination of the deceleration and centrifugal forces

are going to act to move her body to the left of the interior of the vehicle, correct?

A:     Yes.

Id. at p. 24: 7-20.

Despite this acknowledgement and the acknowledged effects of rotational/centrifugal

forces, Dr. Woodhouse's analysis places Mrs. Baez in a centered position (i.e. perfectly centered

on the vehicle up to the commencement of impact) –a finding that is contrary to his own

testimony concerning centrifugal and deceleration forces pre-impact.  His flaw casts his

computer modeling into further dubious light and is starkly inconsistent with the evidence.

Again, this is inconsistent with the Daubert standard of admissible expert opinion.

Further, Dr. Woodhouse admitted that his computer modeling did not account for the deformation of Mrs. Baez's driver's seat or the restraint/lack of restraint provided by the seat. Id. at p. 58: 23-25; pg. 59, 1-5. Further, he does not know how far off the original center line or how far off the Y-axis (vertical) the driver seat moved and rotated during the collision and impact, despite the photographs of the interior showing that the driver's seat had been severely deformed during the crash and impact with the tree. Id. at p. 60: 6-23; see also photos of vehicle interior.

Dr. Woodhouse also admitted, in light of physical evidence clearly showing significant intrusion into the left side of the vehicle as a result of the impact with the tree, and in acknowledgement of the fact that that Mrs. Baez, as the occupant, would have been moving to the left at the same time the structure of the vehicle was being deformed to the right, he did not perform any computer modeling to show the dynamic relationship between Mrs. Baez and the vehicle. In other words, his computer modeling treats the vehicle as a static structure, which is completely inconsistent with the hard evidence. Id. at pg. 64, 18-25; pg. 65, 1-3. He admits this significant flaw; although his computer modeling shows the vehicle at a static position, there is "no question" that there was a dynamic deformation of the vehicle from the left to the right into the driver's compartment "in reality." Id. at pg. 65, 4-21. As an illustration among others, on that point, he also answered the following question in the affirmative:

Q:      Alright. Now, sir, isn't it true the in the real world impact here that crush of the vehicle would have certainly been dynamically from the left to the right? Correct?

A:      Yes.

Id. at pg. 66, 18-22.

Moreover, Dr. Woodhouse admitted that he clearly could have performed a MADYMO computer model run with the very same inputs he had been provided by Dr. Bynum, with an _unrestraint_ occupant, such as Mrs. Baez, but did not do so. Id. at pg. 69, 12-17.[6]

In sum, Mr. Bynum's and Dr. Woodhouse's evaluation, analysis and conclusions discussed above fail to meet the <u>Daubert</u> standard for the reasons cited herein and should be precluded.

WHEREFORE, the Plaintiff, OSCAR BAEZ, as Personal Representative of the Estate of MARTHA BAEZ, Deceased, requests an Order consistent with the foregoing.

Date:   January 17, 2012

Respectfully submitted,

_____/s/_____

Joseph J. Slama, Esq.
Mark R. Giuliani, Esq.
KRUPNICK, CAMPBELL, MALONE, BUSER, SLAMA, HANCOCK LIBERMAN & MCKEE, P.A.
12 SE 7th Street, Suite 801
Legacy Bank Building
Fort Lauderdale, Florida 33301
Telephone:   (954) 763-8181
Facsimile:   (954) 763-8292
E-mail:   jslama@krupnicklaw.com
           mgiuliani@krupnicklaw.com

- - and - -

---

[6] Interestingly, he admits that several of his MADYMO computer models of a *restrained* occupant actually show the head passing through the B-pillar and other points of structure of the vehicle. **Exhibit I** at p. 109. However, he unpersuasively characterizes all runs as "artifacts" and not part of his analysis. Id.

W. Randolph Barnhart, Esq.
W. RANDOLPH BARNHART, PC
50 South Steele Street, Suite 500
Denver, Colorado 80202
Telephone:     (303) 377-6700
Facsimile:     (303) 377-6705
E-mail:        rbarnhart@rbarnhartlaw.com
Admitted *Pro Hac Vice*

*Counsel for Plaintiff OSCAR BAEZ, as Personal Representative of the Estate of Martha Baez, Deceased*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 17, 2012, I filed the foregoing document with the Clerk of Court. The foregoing document was served by mail on all counsel or parties of record on the service list.

_____/s/_____

**MASTER SERVICE LIST**

*Baez* v. *Bridgestone Americas Tire Operations, LLC, et al.*

Case No.:  0:10-CV-62344-MGC

United States District Court, Southern District of Florida

| | |
|---|---|
| Lee P. Teichner, Esq.<br>Maria E. Enriquez, Esq.<br>Lyndall M. Lambert, Esq.<br>Cary O. Aronovitz, Esq.<br>HOLLAND & KNIGHT, LLP<br>701 Brickell Avenue, Suite 3000<br>Miami, Florida  33131<br>Telephone:        (305) 374-8500<br>Facsimile:        (305) 789-7799<br>E-mail:        lee.teichner@hklaw.com<br>        maria.enriquez@hklaw.com<br>        lyndall.lambert@hklaw.com<br>        cary.aronovitz@hklaw.com<br><br>*Counsel for Defendant BRIDGESTONE<br>AMERICAS TIRE OPERATIONS, LLC* | David M. Tarlow, Esq.<br>QUINTAIROS, PRIETO, WOOD &<br>BOYER, P.A.<br>One East Broward Boulevard, Suite 1400<br>Fort Lauderdale, Florida  33301<br>Telephone:        (954) 523-7008<br>Facsimile:        (954) 523-7009<br>E-mail:        dtarlow@qpwblaw.com<br><br>*Counsel for:        Defendant WAL-MART<br>        Defendant BASIL DIXON* |
| Armando P. Rubio, Esq.<br>Henry Salas, Esq.<br>COLE SCOTT & KISSANE, P.A.<br>Dadeland Centre II<br>9150 South Dadeland Boulevard, #1400<br>Miami, Florida  33156<br>Telephone:        (786) 268-6813<br>        (305) 350-5300<br>Facsimile:        (305) 373-2294<br>E-mail:        armando.rubio@csklegal.com<br>E-mail:        henry.salas@csklegal.com<br><br>Counsel *for Defendant FORD MOTOR<br>COMPANY* | |